# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**DEVONTE M. WILLIAMS,**

        **Plaintiff,**

  v.                          **Case No. 24-CV-1361**

**CHRISTOPHER STEVENS, *et al.*,**

        **Defendants.**

---

## DECISION AND ORDER

---

Plaintiff Devonte M. Williams, who is incarcerated and representing himself, brings this lawsuit under 42 U.S.C. § 1983. Williams was allowed to proceed against the defendants on claims pursuant to the First Amendment because they allegedly restricted in-person visits with his lawyer and suspended his ability to speak on the phone with his lawyer. The parties have consented to the jurisdiction of a magistrate judge. (ECF Nos. 4, 13.)

## FACTS

At all times relevant Williams was incarcerated at Green Bay Correctional Institution (GBCI). (ECF No. 33, ¶ 1.) Defendant Jay VanLanen was a supervising officer II (Captain) at GBCI at the time. (*Id.*, ¶ 2.) Defendant John Kind was GBCI's security director, and defendant Christopher Stevens was GBCI's Warden. (*Id.*, ¶¶ 3-4.) Defendant Kyle Grabowski was the offender records supervisor at GBCI. (*Id.*, ¶ 6.)

On October 17, 2022, William's lawyer, Heather Richmond, had a visit scheduled with Williams. (ECF No. 33, ¶ 31.) Richmond was stopped at the security desk because there was an issue with her ID—she presented one ID that was no longer valid with the name "Heather Richmond" and one ID that was valid with the name "Heather Wilson". (*Id.*, ¶ 32.) She presented her Wisconsin State Bar Card as well, which was under "Heather Richmond". (*Id.*) The officer at the security desk, Sergeant Ramirez (not a defendant), requested that Deputy Warden Michelle Haese review Richmond's IDs and approve the visit. (*Id.*, ¶¶ 7, 33.) When Haese spoke with Richmond, she noticed Richmond was "wearing a white, translucent (see through) shirt. Ms. Haese could see her breasts through the shirt." (*Id.*, ¶ 36.) GBCI has a dress code for visitors, and this shirt violated that policy. (*Id.*, ¶¶ 19, 37.) As a result, Haese did not allow Richmond to visit Williams that day because of her inappropriate shirt. (*Id.*, ¶ 38.) A security officer (unidentified in the record) informed Williams that his attorney visit was cancelled. (*Id.*, ¶ 40.) Williams asserts that Richmond was not dressed inappropriately, and the visit should not have been cancelled on that basis. (*Id.*, ¶ 37.)

After Richmond left, Haese wrote an incident report and asked Kind, as security director, to send a warning letter to Richmond. (ECF No. 33, ¶ 42.) On October 17, 2022, Kind mailed a letter to Richmond informing her that her visiting privileges (for both professional visits and personal visits) could be suspended or revoked if she failed to follow visitor policy. (*Id.*, ¶ 44.)

On February 13, 2024, Williams had an attorney visit with Richmond. (ECF No. 33, ¶ 50.) While the visit was ongoing, an unidentified staff member "brought concerns

about Williams's behavior . . . to Van Lanen's attention". (*Id.*) The staff member observed Williams bringing candies to the appointment to give to Richmond and voiced concerns about how Williams behaved at the beginning of the visit. (*Id.*)

Based on this report, VanLanen reviewed the surveillance video of Williams's visit with Richmond. (ECF No. 33, ¶ 52.) VanLanen observed Williams with candies from the canteen on the table in the visiting room. (*Id.*, ¶ 54.) They remained there until another staff member told Williams to throw them away. (*Id.*) VanLanen also noted that at the beginning of the visit Williams reached into Richmond's bag and took her laptop out of the bag for her, which according to Van Lanen is unprofessional behavior. (*Id.*, ¶¶ 56, 57.)

Van Lanen states that, shortly thereafter, "Williams intentionally reaches and grabs document out of Attorney Richmond's lap, then a few seconds later returns the documents to Attorney Richmond's lap, placing them upright near/against her breast." (ECF No. 33, ¶ 58.) Van Lanen characterizes this also as unprofessional behavior. (*Id.*) Richmond then gave a yellow legal pad to Williams, who 18 minutes later placed it in his folder that contained the paperwork he brought with him to the visit. (*Id.*, ¶ 59.) Van Lanen asserts this is not allowed because the legal pad is considered contraband. (*Id.*)

Williams then took "a bunch of torn up little papers, ball[ed] them up in a bigger piece of paper and [gave] the balled-up paper to Attorney Richmond. Attorney Richmond then place[d] the balled-up paper in her bag." (ECF No. 33, ¶ 61.) According to Van Lanen, this has "security implications" because "these papers could have contained hidden messages and/or threats against people that could have been reassembled

outside the institution and could place the safety and security of [Williams], other [prisoners], or staff at risk." (*Id.*, ¶ 63.)

Richmond then took her glasses off and handed them to Williams, "who proceeds to thoroughly clean them before Williams places them back on Attorney Richmond's face." (ECF No. 33, ¶ 64.) Van Lanen notes this is "inappropriate contact for a professional attorney visit." (*Id.*, ¶ 65.) At the end of the visit, Williams helped Richmond into her coat and then hugged Richmond before she left the visiting booth. (*Id.*, ¶ 66.) Van Lanen states this is also inappropriate contact for a professional visit. (*Id.*, ¶ 67.) According to Van Lanen, appropriate contact for a professional visit is limited to a handshake. (*Id.*, ¶ 68.)

Williams takes issue with Van Lanen's observations. He states that he brought peppermints for himself during the visit, and they were not intended for Richmond. (ECF No. 33, ¶ 50.) He does not dispute that prisoners are not allowed to bring food into a professional visit. (*Id.*, ¶ 55.) He states that Van Lanen was overreacting to their behavior. (*Id.*, ¶ 53.) He admits to asking Richmond if she wanted help setting up her laptop. (*Id.*, ¶ 57.) Any contact Williams may have had near Richmond's chest was unintentional as the two of them were sorting through legal documents. (*Id.*, ¶ 58.)

As for the concerns about contraband, Williams says he was given the legal pad to fill with questions and return it to Richmond the following week. (ECF No. 33, ¶ 59.) He was unaware that exchanging legal work was considered contraband. (*Id.*) The torn up and balled up paper was merely trash, and Richmond was being helpful in taking them for him. (*Id.*, ¶ 61.) Williams states he could not throw them in the trash because

4

an officer moved the trash can just prior to Richmond's visit. (*Id.*) He does not dispute the he cleaned Richmond's glasses  but notes that he does not believe that violated the visitation rules. (*Id.*, ¶¶ 64-65.) Williams also admits he hugged Richmond but asserts that they are also personal friends, so the hugging was not inappropriate or in violation of the visitation rules. (*Id.*, ¶ 67.)

The court has the benefit of that video. The video confirms that Williams had candy and then disposed of it. (ECF No. 24-7 at 7:29-11:38.) It also shows Williams helping Richmond set up her laptop. (*Id.* at 13:39.) Williams can be seen shuffling through paper with Richmond, but the inappropriate touching Van Lanen described is not readily apparent. (*Id.* at 1:08:03-1:08:15) Richmond gives Williams a yellow legal pad, and the video shows approximately 18 minutes later Williams placing the legal pad with his paperwork. (*Id.* at 1:33-:18-1:50:50.) The video also clearly shows Richmond taking the balled-up paper and placing it in her bag. (*Id.* at 1:51:03-1:52:56.) Williams is also seen cleaning Richmond's glasses and placing them on her face. (*Id.* at 2:04:57-2:05:59.) At the end of the visit, the video confirms that Williams helped Richmond into her coat, and they hugged. (*Id.* at 2:12:26-2:13:28.)

After reviewing the video, Van Lanen spoke with other staff members and learned that Richmond is also on Williams's personal visitor list under the name "Heather Wilson." (ECF No. 33, ¶ 70.) He saw that Richmond had visited Williams under the name "Wilson" on January 9, 2024, so he reviewed video of that visit. (*Id.*, ¶ 71.) In that video Williams and Richmond hugged and kissed at the beginning and end of the visit, which is permitted under personal visitation rules. (*Id.*, ¶ 73.) GBCI allows prisoners

and their personal visitors to have their photo taken during the visit. (*Id.*, ¶ 74.) Williams and Richmond decided to take advantage of this opportunity and stood in line to have their photo taken. (*Id.*, ¶ 76.) While in line Williams kissed Richmond, which is inappropriate under the visitation rules, which do not allow anything more than hand-holding during the middle of visits. (*Id.*, ¶¶ 74-76.) Williams does not dispute what occurred during the visit but notes that, if his conduct was inappropriate, he should have received a conduct report but did not. (*Id.*, ¶ 75.) The court also has two videos of this visit, from different angles, and the videos confirm Van Lanen's account. (ECF No. 24-8, 24-9.)

Sometime shortly after the visit on February 13, 2024 (it is unclear from the record when), Kind asked Van Lanen "to send him the incident report and viewed the video from February 13, 2024." (ECF No. 33, ¶ 77.) Kind determined that "[t]he behavior displayed by Williams and Attorney Richmond was unprofessional and frankly concerning." (*Id.*, ¶ 77.) He also decided that Richmond's visitor privileges should be suspended for 180 days and notified Richmond and Williams of this decision by letter. (*Id.*, ¶ 78.) Williams maintains that Kind's determinations are "exaggerated" and that the behavior did not violate any policy. (*Id.*, ¶ 77.) Richmond was also informed that she could appeal Kind's determination by writing a letter to the Warden. (*Id.*, ¶ 79.)

On February 20, 2024, Kind received a letter from Williams stating that Williams was upset that Richmond's visiting privileges had been suspended. (ECF No. 33, ¶ 80.) Kind responded to Williams that the suspension was warranted because Williams and Richmond exchanged a notepad, and Richmond took the balled-up pieces of paper. (*Id.*,

6

¶ 81.) Kind notes that during the suspension period Williams and Richmond could write letters to each other; Williams was allowed to call Richmond; and other members of Richmond's staff could visit Williams. (*Id.*, ¶ 82.) Williams states that, because he was in the Restrictive Housing Unit (RHU), he was unable to write Richmond as his property had been confiscated. (*Id.*) His time in RHU also prevented him from calling Richmond because he was limited to one call per day late in the day, which was after business hours. (*Id.*)

Around April 5, 2024, Grabowski learned that Richmond was trying to set up an attorney call with Williams. (ECF No. 33, ¶ 83.) He was also aware of an entry made in the system about Richmond's suspension of visiting privileges. (*Id.*) Grabowski emailed Kind to ask  if the suspension also prohibited phone calls. (*Id.*, ¶ 84.) Kind delayed scheduling the attorney call while his staff "consulted with superiors in the Department of Corrections as to whether or not that was part of the suspension." (*Id.*, ¶ 86.) On April 22, 2024, a decision was made that calls were not included in the suspension. (*Id.*, ¶ 87.) Grabowski states his office scheduled a call between Williams and Richmond as soon as Williams requested one. (*Id.*, ¶ 88.) Williams states there was no scheduled call because he did not make a request after April 5, 2024. (*Id.*)

It is undisputed that Warden Stevens's involvement began when he was copied on the February 15, 2024, letters notifying Williams and Richmond of the suspension of visiting privileges. (ECF No. 33, ¶ 94.) Stevens also watched videos of the visits in order to respond to an appeal of the suspension, but no appeal was received. (*Id.*, ¶¶ 95-96.)

7

Stevens also was the reviewing authority on Williams's inmate complaint regarding the suspension. (*Id.*, ¶ 97.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406

F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Williams claims that the defendants violated his First Amendment rights when they restricted his visits with Richmond, prevented Richmond from scheduling calls, and made it difficult for him to call Richmond. "The First Amendment protects a prisoner's right to consult with an attorney"; however, it "does not mandate unrestricted and unlimited private contacts with counsel, and prisons may restrict prisoner contact with counsel so long as the restrictions reasonably relate to legitimate penological interests." *Lashbrook v. Hyatte*, 758 Fed. App'x 539, 541 (7th Cir. 2019) (citations omitted).

To determine whether restrictions reasonably relate to a legitimate penological interest, the United States Supreme Court has outlined four factors for the district court to consider:

> (1) whether there is a rational relationship between the regulation and the legitimate government interest advanced; (2) whether the inmates have alternative means of exercising the restricted right; (3) whether and the extent to which accommodation of the asserted right will impact prison staff, inmates' liberty, and the allocation of limited prison resources; and (4) whether the contested regulation is an 'exaggerated response' to prison concerns and if there is a 'ready alternative' that would accommodate inmates' rights.

*Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010) (quoting *Turner v. Safley*, 482 U.S. 78, 89-91 (1987)). The Seventh Circuit Court of Appeals has elaborated that the first factor "can act as a threshold factor", and "[w]here . . .there is only minimal evidence

9

suggesting that the prison's regulation is irrational, running through each factor at length is unnecessary. *Mays v. Springborn,* 575 F.3d 643, 648 (7th Cir. 2009).

The defendants argue that the suspension of in-person visits was justified because they believed that contraband was possibly being introduced into the prison population and that Williams could potentially be using Richmond to get messages outside the institution or that Richmond was giving Williams paper that was laced with drugs. They also had concerns about the inappropriate professional relationship Williams had with Richmond.

Because the defendants have met their burden of demonstrating that the visiting restriction was reasonably related to a legitimate penological interest, the burden shifts to Williams to demonstrate that the restriction was irrational. *Singer,* 593 F.3d at 534. Williams argues that the defendants' reaction was overexaggerated, and he was not trying to bring contraband into the prison or trying to sneak messages to the outside world. But what matters is whether the defendants' belief was reasonable. Courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta,* 539 U.S. 126, 132 (2003). A court "must distinguish between inferences related to disputed facts and those related to disputed matters of professional judgment." *Singer,* 593 F.3d at 534. When it comes to disputed matters of professional judgment, deference is given "to the views of prison authorities." *Id.*

The video shows Williams taking a legal pad from Richmond and Richmond taking balled-up paper from Williams. The defendants determined that these actions were a security risk. This assumption was reasonable. *See Williams v. Eckstein*, 21-cv-1334, 2023 WL 2480269 at * 7 (E.D. Wis. March 13, 2023) (holding that restricting visits on the suspicion of contraband entering the institution reasonably related to a legitimate penological interest). Also, while the court need not consider whether Williams's relationship with Richmond was inappropriate to the extent that visitor restrictions were necessary (because the contraband and messages are enough to demonstrate a legitimate penological interest), the court notes that the relationship does provide context in the sense that Williams and Richmond had a history of flouting visitor policies. Indeed, Richmond had been warned prior to the February 13 visit that her visitation privileges could be restricted if she failed to follow visitor policy. The nature of their relationship further supports the rationality of the defendants' professional judgment.

In short, because Williams has not demonstrated that the defendants' exercise of professional judgment in suspending his in-person visits were not reasonably related to a legitimate penological interest, he cannot prevail at summary judgment for the restriction of in-person visitation.

Williams also claims that the defendants unconstitutionally restricted his phone access. His alleges that he was unable to call Richmond while housed in the RHU and that there was a three-week period in which Richmond was not allowed to schedule an attorney call with him. But Williams was not prevented from calling Richmond while

11

he was in RHU; he was just limited to calling her at a time he believed was inconvenient. As for the three-week delay before allowing Richmond to call Williams, Kind determined he needed to check with DOC supervisors to understand the nature of Richmond's suspension. Williams does not provide any evidence that this decision was irrational. Also, during this time it is undisputed that Williams still had access to Richmond's staff, who could visit him. Thus, he was never fully cut off from legal representation. As such, Williams's inability to speak to Richmond over the phone did not prevent him from accessing legal representation and at most amounted to a temporary inconvenience.

Because the court has determined that Williams, as a matter of law, did not suffer a constitutional violation, it does not need to consider whether Grabowski or Stevens had any personal liability. For either of them to be held liable, "it logically follows that there must exist an underlying constitutional violation." *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). Summary judgment is granted in the defendants' favor.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted. The defendants also argued that they were entitled to qualified immunity but because the court found in their favor on the merits, it does not need to address the qualified immunity argument. Because there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (ECF No. 20) is **GRANTED.**

12

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

13

Dated at Milwaukee, Wisconsin this 1st day of May, 2026.

BY THE COURT

WILLIAM E. DUFFIN
United States Magistrate Judge

14